UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOBBY AUSTIN,<br><br>                     Plaintiff,<br><br>v.<br><br>THE CALIFORNIA STATE UNIVERSITY,<br><br>                     Defendant. | Case No.: 3:15-cv-01930-GPC-BLM<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF No. 23.]** |

Before the Court is Defendant Trustees of the California State University's ("Defendant's" or "CSU's") motion for summary judgment.[1] (Dkt. No. 23.)[2] Plaintiff Bobby Austin ("Plaintiff"), proceeding *pro se*, did not file a response. Defendant accordingly did not file a reply. (Dkt. No. 25.) The Court deems Plaintiff's motion suitable for disposition without oral argument pursuant to Civil Local Rule 7.1(d)(1). Based on the moving papers, the supporting documentation, and the applicable law, the Court **GRANTS** Defendant's motion for summary judgment.

////

---

[1] Defendant was formerly erroneously sued herein as San Diego State University. For clarity, the Court will hereinafter refer to Defendant as CSU, rather than SDSU, but will use "SDSU" when discussing facts relevant to San Diego State University.

[2] All citations to the record are based upon the pagination generated by the CM/ECF system.

# FACTUAL BACKGROUND

## I.   Plaintiff's Employment at SDSU

On October 24, 2013, Plaintiff, who is black, was hired as a full-time temporary custodian at SDSU. (Dkt. No. 23-4, Defendant's Separate Statement of Uncontroverted Facts ("Def.'s SSUF") ¶ 1.)[3] Plaintiff learned about the position from Associate Director of Physical Plant Johnny Eaddy, who he had become acquainted with through their sons' participation in Pop Warner football. (*Id.* ¶ 2.) Plaintiff worked at SDSU as a temporary custodian from October 31, 2013 until April 1, 2014. (*Id.* ¶ 4.)

On April 1, 2014, Plaintiff's status changed from temporary to probationary, rendering him eligible to gain permanent status in his position beginning on April 1, 2015. (*Id.* ¶ 5.) Article 9.48 of the Collective Bargaining Agreement ("CBA") governing Plaintiff's probationary employment provided that Plaintiff would become a permanent employee of CSU only upon successful completion of a one-year probationary period. (*Id.* ¶ 9.)

On February 4, 2015, Plaintiff received notice that his probationary employment would be terminated effective February 18, 2015. (*Id.* ¶ 10.) Plaintiff was terminated prior to the end of his probationary period and did not become a permanent employee of CSU. (*Id.* ¶ 11.)

## II.   Plaintiff's Job Performance

Sharon Cunningham, who is black, was Plaintiff's direct supervisor during all but the first week of Plaintiff's probationary employment with SDSU. (*Id.* ¶ 6.) Johnny Eaddy, who is black, was Plaintiff's second-line supervisor throughout his employment with SDSU. (*Id.* ¶ 7.) John Ferris, who is white, was Plaintiff's third-line supervisor throughout his employment with SDSU. (*Id.* ¶ 3.)

---

[3] Citations to Defendant's Separate Statement of Uncontroverted Facts incorporate by reference the specific citations to the record contained within the individual paragraphs of Defendant's Statement.

Cunningham and Plaintiff worked the same shift (3:00 a.m. to 12:00 p.m.) throughout Plaintiff's employment with SDSU. (*Id.* ¶ 8.) Pursuant to Article 10 of the CBA, Cunningham provided Plaintiff with two performance evaluations during his probationary employment—one in July 2014 and another in October 2014. (*Id.* ¶ 12.)

In his first performance evaluation, Plaintiff received an overall "satisfactory" rating, with "satisfactory" ratings in every category except for attendance, for which Plaintiff received a "marginal" rating. (*Id.* ¶ 13.) Cunningham gave Plaintiff a "marginal" rating in attendance because Plaintiff used sick leave an average of two to three times per month. (*Id.*) Cunningham stated that Plaintiff used "an unusually high amount of leave usage for a probationary employee," and that Plaintiff imposed an additional burden on his colleagues to cover the work he did not complete. (*Id.*) At his evaluation, Cunningham informed Plaintiff that he needed to improve his attendance. (*Id.* ¶ 14.) Plaintiff signed the evaluation because he agreed with it. (*Id.*)

In Plaintiff's second performance evaluation, Cunningham noted that Plaintiff's attendance had improved since his July 2014 evaluation. (*Id.* ¶ 20.) However, after his October 2014 evaluation, and prior to his February 2015 termination, Plaintiff's sick leave usage increased again. (*Id.* ¶ 21.)

Plaintiff's leave usage records corroborate Cunningham's observations of Plaintiff's attendance. (*Id.* ¶ 16.) During his probationary employment (April 1, 2014 until his termination on February 18, 2015), Plaintiff used sick leave for himself on at least fourteen occasions and sick leave for his family on three occasions. (Dkt. No. 23-2 at 174, Compendium Ex. 7; Dkt. No. 23-3 at 13–22, Compendium Ex. 14.) On at least two other occasions, Plaintiff resorted to using vacation time to cover his absences because he had exhausted his sick leave allowance. (Dkt. No. 23-4, Def.'s SSUF ¶ 17.) Plaintiff did not have any chronic medical conditions during his probationary employment. (*Id.* ¶ 18.)

In the fall of 2014, Plaintiff was assigned to work in the library, which is open 24/7, heavily trafficked, and requires constant maintenance. (*Id.* ¶ 22.) In November

2014, Naomi Thomas, Plaintiff's Lead Custodian, reported to Cunningham that Plaintiff was not staying in his assigned work area and was being rude to her. (*Id.* ¶ 23.) To facilitate a resolution, Cunningham conducted a meeting with Plaintiff and Thomas. (*Id.*) At the meeting, Plaintiff became "irate" and "argued" with Cunningham, stating that he knew how to do his job and that he had his "own way" of performing his duties. (*Id.* ¶ 24.)

While checking on Plaintiff's work area in December 2014, Cunningham discovered that Plaintiff was storing cleaning chemicals in inaccurately labeled containers in violation of SDSU policy and Plaintiff's training. (*Id.* ¶ 25.) Cunningham states that when she spoke to Plaintiff about the importance of accurately storing cleaning chemicals, Plaintiff responded that "he knew what they were." (*Id.*) Although Cunningham emptied the bottles' contents and refilled them accurately, she subsequently discovered upon inspection that Plaintiff had again refilled the bottles with incorrect chemicals. (*Id.*)

In addition, on multiple occasions in November and December 2014, Cunningham observed Plaintiff vacuuming in the library without placing a caution sign to alert passers-by to the presence of a cord stretched out across the floor. (*Id.* ¶ 26.) Cunningham states that each time she observed this occur, she instructed Plaintiff not to stretch the vacuum cord across the floor absent a caution sign because it was a tripping hazard. (*Id.*) However, Plaintiff ignored her instructions each time. (*Id.*) On December 10, 2014, Cunningham wrote an email to her supervisor, Johnny Eaddy, detailing her concerns about Plaintiff's work habits and attitude. (*Id.* ¶ 28.)

On or about January 9, 2015, Plaintiff did not complete a floor cleaning job as requested. (*Id.* ¶ 29.) As a result, Cunningham completed the task herself with assistance from two employees. (*Id.*) That same day, Cunningham wrote another email to Eaddy regarding Plaintiff's work habits and attitude. (*Id.*; Dkt. No. 23-7, Cunningham Decl. ¶ 19.)

Cunningham states that on each occasion she directed Plaintiff about his work, he behaved in a "confrontational and intimidating" manner and responded by saying that he had "a process" and would continue to perform tasks "his way." (Dkt. No. 23-4, Def.'s SSUF ¶ 27.)

### III. Plaintiff's Termination

In January 2015, Cunningham determined that Plaintiff did not have the appropriate work ethic or temperament to become a permanent employee at SDSU and accordingly recommended to Eaddy that Plaintiff's probationary employment be terminated. (*Id.* ¶ 30.) Cunningham states that she based this determination on ongoing problems with Plaintiff's attendance, attitude, and repeated failure to follow her instructions. (*Id.*)

On or about February 3, 2015, Eaddy requested authorization from human resources to terminate Plaintiff's probationary employment. (*Id.* ¶ 31.) Eaddy based his decision on input from Cunningham and his personal knowledge of Plaintiff's attendance problems. (*Id.*) Employment and Classification Manager Isidro Cervantes authorized the termination of Plaintiff's probationary employment on February 3, 2015, based on the information Eaddy supplied and on his personal knowledge of Plaintiff's attendance problems. (*Id.* ¶ 32.)

On February 4, 2015, Plaintiff received notice that his probationary employment would terminate on February 18, 2015. (*Id.* ¶ 33.)

### IV. Plaintiff's Non-Selection for Manager Position

During the fall of 2014, prior to his termination, Plaintiff applied for a Custodial Services Manager position at SDSU, both online and in person to John Ferris. (*Id.* ¶ 36; Dkt. No. 23-3 at 26–27, Compendium Ex. 16.) According to Plaintiff, Ferris responded positively and encouraged Plaintiff when Plaintiff spoke to him about his intent to apply for the position. (Dkt. No. 23-4, Def.'s SSUF ¶ 36.)

The Custodial Services Manager directly supervises three custodial supervisors and has oversight responsibility for about eighty custodial employees. (*Id.* ¶ 49.) According

to the position description, the Custodial Services Manager is the principal campus administrator to provide leadership and direction for the management of all activities and programs that support the delivery of custodial services to the campus.  (Dkt. No. 23-3, Compendium Ex. 20.)  The minimum qualifications for the position require a bachelor's degree and a minimum of five years of supervisory experience in a facilities operation environment, or an equivalent combination of education and experience.  (*Id.*)

On February 2, 2015, Ferris interviewed Plaintiff and six other candidates by telephone for the Custodial Services Manager position.  (Dkt. No. 23-4, Def.'s SSUF ¶¶ 36, 48.)  For each candidate, Ferris used a "Phone Interview Rating Form" with two predetermined questions: (1) "Please tell me about your supervisory experience" with two sub-questions: (a) "How many buildings have you overseen?" and "What's the largest number of employees you've supervised?"; and (2) "Briefly describe your experience in a labor relations environment."  (*Id.* ¶ 52.)

Plaintiff informed Ferris that he supervised employees in four to five buildings at the University of Phoenix as a Call Center Supervisor, and that he had previously supervised over fifty employees as a supervisor at a Vons store.  (*Id.* ¶ 54.)  Ferris observed that Plaintiff's supervisory experience did not involve facilities services.  (*Id.*)  Plaintiff's only other experience in facilities services outside of his position at SDSU stemmed from working in janitorial services at Vons for about a year and a half, working in maintenance at Costco, and accompanying his mother on her cleaning jobs when he was a child.  (*Id.* ¶ 55; Dkt. No. 23-5 at 10, Austin Depo. at 20:05–21.)

Of the seven candidates interviewed on February 2, 2015, Ferris recommended that only three continue in the selection process; Plaintiff was among the candidates who were disqualified for lack of sufficient experience.  (Dkt. No. 23-4, Def.'s SSUF ¶ 51.)  Plaintiff alleges that Ferris approved his termination on January 30, 2015 before interviewing him for the management position on February 2, 2015.  (*Id.* ¶ 34.)  Ferris states that Plaintiff was not disqualified from competing for the Custodial Services Manager position due to the pending termination of his probationary employment, and

that he did not consider Plaintiff's pending termination as a factor in the selection progress. (*Id.* ¶ 50.) Rather, Ferris found that out of the six rated criteria, Plaintiff met qualifications in only one category: experience in supervising over fifty employees. (*Id.* ¶ 56.) Plaintiff partially met qualifications in four other categories, but failed to meet qualifications for the category: "ability to supervise and provide leadership to a large staff involved in facility maintenance and development activities in a major university setting and a bargaining unit environment." (*Id.*) Accordingly, Ferris determined that Plaintiff lacked sufficient experience and disqualified him from further consideration. (*Id.*) In contrast, Ferris determined that the three candidates selected to continue in the process met or exceeded the minimum qualifications for the position. (*Id.* ¶ 58.)

Plaintiff, however, contends that Ferris discriminated against him by selecting a white applicant who is substantially less qualified than him. (*Id.* ¶ 37; Dkt. No. 15 at 2, SAC ¶ 7.) Specifically, Plaintiff cites the fact that the successful candidate only had a bachelor's degree, whereas Plaintiff had an MBA. (Dkt. No. 23-5 at 37–39, Austin Depo. at 65:16–67:25.) Anthony Kopacz, the successful candidate, was a white male who had twenty-two years of experience supervising up to thirty employees and who had previously served as an Assistant Director of Facilities in a university environment. (Dkt. No. 23-4, Def.'s SSUF ¶ 59.) Ferris additionally states that Kopacz distinguished himself from the other candidates by his interview performance. (*Id.* ¶ 60.) Kopacz described his leadership style and discussed his employees in a manner that indicated to Ferris that Kopacz had the right personality to lead the custodial staff at SDSU. (*Id.*)

V. **Plaintiff's Alleged Harassment**

Plaintiff alleges that after he applied for promotion to the Custodial Services Manager position in mid-October 2014, Cunningham subjected him to harassment, including, *inter alia*,

> reviewing his performance of his duties, and directing him in how he should perform his duties, even though (i) he performed his duties in a fully successful and satisfactory manner without his supervisor's review and direction, and (ii) his

supervisor did not engage in such review and direction with any non-Black employees.

(Dkt. No. 15 at 2; SAC ¶ 5.) Specifically, Plaintiff states that Cunningham frequently, although inconsistently, micromanaged him, told him how to perform his job, informed Plaintiff that he was not professional, spoke disrespectfully toward him, attempted to provoke him, and talked down to him, making statements like, "Do I need to treat you like my grandkids?" (Dkt. No. 23-4 at 9, Def.'s SSUF ¶ 46; Dkt. No. 23-3 at 26–27, Compendium Ex. 16; Dkt. No. 23-5 at 61, Austin Depo. at 90:06–20.) Plaintiff asserts that Eaddy "ha[d] it out for him" because Plaintiff has an MBA degree, whereas Eaddy does not, and that Cunningham was similarly threatened by Plaintiff's superior educational background because Plaintiff had the potential to be her boss. (Dkt. No. 23-4 at 9, Def.'s SSUF ¶ 41; Dkt. No. 23-3 at 26–27, Compendium Ex. 16.)

## PROCEDURAL BACKGROUND

Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission and received a notice of right to sue dated June 10, 2015. (Dkt. No. 10, ¶ 10.) On September 1, 2015, Plaintiff filed a Complaint against San Diego State University ("SDSU"). (Dkt. No. 1.) On October 6, 2015, summons was returned executed. (Dkt. No. 3.) A process server executed service on a "Nancy Demich Analyst" on the SDSU campus on September 3, 2015. (*Id.*)

On October 14, 2015, default was entered against SDSU for failure to answer or otherwise timely respond to the Complaint. (Dkt. Nos. 5, 6.) On October 20, 2015, Plaintiff filed a motion for default judgment. (Dkt. No. 8.) On December 14, 2015, the Court granted Plaintiff leave to amend his Complaint, vacated the Clerk of the Court's entry of default, denied Plaintiff's motion for default judgment with leave to amend, and indicated that it was uncertain whether "Nancy Demich Analyst" was authorized to accept service on behalf of Defendant. (Dkt. No. 10.)

On December 18, 2015, Plaintiff filed his First Amended Complaint ("FAC"). (Dkt. No. 11.) On December 23, 2015, summons was returned executed. (Dkt. No. 12.)

A process server again executed service on a "Nancy Demich Analyst" on the SDSU campus on December 18, 2015. (*Id.*)

On February 1, 2016, Plaintiff filed a motion for leave to file a Second Amended Complaint ("SAC"). (Dkt. No. 13.) On February 8, 2016, the Court granted Plaintiff leave to amend his FAC and correct his pleading to reflect the proper defendant: the California State University. On February 16, 2016, Plaintiff filed his SAC, the operative complaint, against CSU, alleging claims for race-based discrimination and harassment in violation of Title VII. (Dkt. No. 15.)

On November 17, 2016, Defendant filed a motion for summary judgment on all causes of action in Plaintiff's SAC. (Dkt. No. 23.) In its motion, Defendant asserts that (1) Plaintiff's claim for discrimination in violation of Title VII fails because the uncontroverted facts demonstrate that Defendant had legitimate and nondiscriminatory reasons for any alleged adverse actions, and that (2) Plaintiff's claim for harassment in violation of Title VII fails because the uncontroverted facts demonstrate that Plaintiff was not subjected to any unwelcome conduct based on race. (*Id.* at 2.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing

sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322–23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. The Court is "not required to comb the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal citation and quotation marks omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

A motion for summary judgment cannot be granted simply because the nonmoving party fails to file or serve its opposition. *See Henry v. Gill Indus. Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). However, a court may grant an unopposed motion for summary judgment where examination of the claim reveals that it is appropriate to dispose of a claim on summary judgment. *See id.*; *Devermont v. City of San Diego*, No. 12-CV-1823-BEN KSC, 2014 WL 1877450, at *3 (S.D. Cal. May 8, 2014) (same).

/ / / /

# DISCUSSION

Title VII renders it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may show violation of Title VII "by proving disparate treatment or disparate impact, or by proving the existence of a hostile work environment." *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1109 (9th Cir. 1991), *superseded by statute on other grounds*, *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1041 (9th Cir. 2005). Here, Plaintiff asserts two Title VII violations by Defendant: unlawful race-based harassment (hostile work environment) and discrimination (disparate treatment). (Dkt. No. 15, SAC.) CSU moves for summary judgment on both claims. (Dkt. No. 23.)

## I. Plaintiff's Racial Harassment Claim

To establish a *prima facie* hostile work environment claim under Title VII, a plaintiff must raise a triable issue of fact as to whether (1) he was subjected to verbal or physical conduct because of his race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (internal citation and quotation marks omitted). The Ninth Circuit has cautioned that Title VII is not a "general civility code." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal citation, quotation marks, alteration omitted).

Here, CSU contends that Plaintiff's claim fails because (1) he was not subjected to verbal or physical conduct because of his race, and (2) the conduct was not sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an

abusive work environment. (Dkt. No. 23-1 at 12–15.) Because the Court finds that no genuine issue of material fact exists as to whether Plaintiff was subjected to verbal or physical conduct because of his race, the Court need not reach the subsequent question of whether the race-based conduct complained of was sufficiently pervasive or severe.

Here, Plaintiff has not raised a triable issue of fact as to whether he was subjected to verbal conduct on account of the fact that he is black. *See Manatt*, 339 F.3d at 798. Plaintiff alleges that following his application for a promotion, Cunningham began subjecting him to harassing conduct.[4] (Dkt. No. 15 at 2; SAC ¶ 5.) Specifically, Plaintiff states that Cunningham micromanaged him, told him how to perform his job, informed Plaintiff that he was not professional, spoke disrespectfully toward him, attempted to provoke him, and talked down to him, making statements like, "Do I need to treat you like my grandkids?" (Dkt. No. 23-4 at 9, Def.'s SSUF ¶ 46; Dkt. No. 23-3 at 26–27, Compendium Ex. 16; Dkt. No. 23-5 at 61, Austin Depo. at 90:06–20.)

However, viewing this evidence in the light most favorable to Plaintiff, there is no triable issue of fact as to whether the verbal conduct Plaintiff complains of resulted from his race. The conduct of which he complains, although unwelcome and admittedly unprofessional, stems from reasons other than Plaintiff's race. Plaintiff's own testimony belies the same conclusion. Plaintiff asserts that Cunningham was threatened by Plaintiff's superior educational background because Plaintiff had the potential to be her boss. (Dkt. No. 23-4 at 9, Def.'s SSUF ¶ 41; Dkt. No. 23-3 at 26–27, Compendium Ex. 16.) At his deposition, when asked to explain the basis for why he believed that Eaddy and Cunningham discriminated against him on the basis of his race, Plaintiff replied: "I believe it to be the case because I was interested in the position that one was holding and the other that I would be their boss." (Dkt. No. 23-5 at 56, Austin Depo. at 85:16–24.) When asked to further explain how Cunningham and Eaddy indicated that they were

---

[4] Plaintiff states that Eaddy never harassed him. (Dkt. No. 23-5 at 58, Austin Depo. at 87:09–15.)

discriminating against Plaintiff specifically because of his race, Plaintiff responded: "[W]ell, Sharon harassed me. She was harassing me. I'm black. So, I mean, I don't . . . know what else." (*Id.* at 85:25–86:09; *accord* Dkt. No. 23-3 at 26–27, Compendium Ex. 16.) When asked whether Cunningham said anything about Plaintiff's race that he considered to be derogatory, Plaintiff responded that Cunningham did not say anything directly to him, but rather "said things to [him] about other people . . . that was enough to let [him] know." (Dkt. No. 23-3 at 57, Austin Depo. at 86:19–25.) Upon request to further explain his answer, Plaintiff stated, "She would say things like . . . 'We've got to do something like this because if we don't, these people do this.' You know, just derogatory things." (*Id.* at 87:01–05.) However, Plaintiff subsequently clarified that nothing Cunningham said, to his knowledge, was derogatory against black people. (*Id.* at 87:06–08.) To the extent Cunningham made "derogatory" remarks about other people to Plaintiff, Plaintiff names no basis for his belief that the allegedly derogatory remarks were driven by race.

In sum, Plaintiff's sole basis to substantiate his claim that Cunningham subjected him to verbal conduct based on his race consists of his circular explanation that she did so because he is black. Summary judgment is appropriate because there is no genuine issue of material fact as to whether Plaintiff was subjected to verbal conduct because of his race. Because Plaintiff has failed to establish a *prima facie* hostile work environment claim under Title VII, the Court **GRANTS** Defendant's motion for summary judgment as to Plaintiff's harassment claim.

## II.   Plaintiff's Racial Discrimination Claim

A plaintiff must first establish a *prima facie* case of racial discrimination by showing that "(1) he belongs to a protected class, (2) he was qualified for the position, (3) he was subjected to an adverse employment action, and (4) similarly situated individuals [outside of plaintiff's class] were treated more favorably." *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 658 (9th Cir. 2002), *as amended* (July 18, 2002). "The requisite degree of proof necessary to establish a *prima facie* case for Title VII on

summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Cordova v. State Farm Ins. Companies*, 124 F.3d 1145, 1148 (9th Cir. 1997) (internal citation, quotation marks, alteration omitted). If the plaintiff makes a *prima facie* showing,

> [t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. If the employer does so, the plaintiff must show that the articulated reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."

*Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1123–24 (9th Cir. 2000) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). However, the plaintiff's "evidence must be both *specific and substantial* to overcome the legitimate reasons put forth by [the movant]." *Aragon*, 292 F.3d at 659.

Here, Plaintiff complains of two adverse employment actions: the termination of his probationary employment and his non-selection for the Custodial Services Manager position. (Dkt. No. 15 at 3, SAC ¶ 8.) Defendant moves for summary judgment on Plaintiff's disparate treatment claim with respect to both challenged actions. (Dkt. No. 23-1 at 15–21.)

**A. Plaintiff's Termination**

Defendant argues that (1) Plaintiff fails to present any evidence to show that the termination of his probationary employment was due to discrimination, and that (2) Defendant had legitimate, nondiscriminatory reasons to terminate his probationary employment. (Dkt. No. 23-1 at 15–17.)

Here, although neither party explicitly discusses the point, it is unclear as a threshold matter whether Plaintiff has established a *prima facie* case for disparate treatment. Namely, neither party has raised evidence showing that similarly situated, non-black individuals were treated more favorably than Plaintiff with respect to the termination of his probationary employment.

Notwithstanding the lack of briefing and evidence on this issue, even assuming that Plaintiff has established a *prima facie* case for discrimination, Defendant has named legitimate, nondiscriminatory reasons for Plaintiff's termination.  Having previously detailed those reasons at length, *supra* Part II of the Factual Background, the Court will only briefly summarize them here.  Defendant's legitimate, nondiscriminatory reasons for Plaintiff's termination included, *inter alia*: Plaintiff's unusually high usage of sick leave and the resulting increased workload for Plaintiff's coworkers; Plaintiff's behavior toward Thomas and Cunningham; Plaintiff's violation of protocol and creation of safety risks, such as storing cleaning chemicals in inaccurately labeled bottles and neglecting to set out caution signs when vacuuming highly trafficked areas; and Plaintiff's unwillingness to receive and respond to feedback constructively.

Furthermore, it is unlikely that Plaintiff could proffer specific and substantial evidence to persuade the Court that a discriminatory reason motivated the employer or that the employer's proffered reasons are not credible. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) ("In judging whether [the defendant's] proffered justifications were 'false,' it is not important whether they were *objectively* false . . . Rather, courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." (internal citation and quotation marks omitted)).  Plaintiff's own testimony reveals that Eaddy and Cunningham were not motivated by an unlawful race-based motive to recommend his termination.  (Dkt. No. 23-5 at 58–59, Austin Depo. at 87:16–88:01 (providing no other grounds, other than the fact of his termination, to substantiate his claim that Eaddy discriminated against him on account of his race); Dkt. No. 23-5 at 56–58, Austin Depo. at 85:16–87:08 (explaining that Eaddy and Cunningham discriminated against him out of a perceived threat from his superior educational background).)  However, the Court need not reach the question of pretext, as Plaintiff has not opposed Defendant's motion or attempted to demonstrate that Defendant's proffered reasons were pretextual.

As Plaintiff has not raised any specific and substantial evidence to overcome Defendant's legitimate, nondiscriminatory reasons for his termination, and as the Court is "not required to comb the record to find some reason to deny a motion for summary judgment," *Carmen*, 237 F.3d at 1029, summary judgment is appropriate with respect to Plaintiff's disparate treatment claim, to the extent it is premised upon the termination of his probationary employment.

## B. Plaintiff's Non-Selection

Defendant contends that (1) Plaintiff was not qualified for the Custodial Services Manager position and (2) Plaintiff's subjective beliefs regarding his qualifications are insufficient to raise a triable issue of fact. (Dkt. No. 23-1 at 18–21.)

Plaintiff cannot state a *prima facie* case for disparate treatment with respect to his non-selection for the management position, because Plaintiff has shown neither that he was qualified for the position nor that Kopacz, whose qualifications were superior to Plaintiff's, was a similarly situated comparator. The minimum qualifications for the Custodial Services Manager position require a bachelor's degree and a minimum of five years of supervisory experience in a facilities operation environment, or an equivalent combination of education and experience. (Dkt. No. 23-3, Compendium Ex. 20.) Although Plaintiff had supervisory experience as a Call Center Supervisor at the University of Phoenix and as a supervisor at a Vons store, none of Plaintiff's supervisory experience stemmed from a facilities services environment. (Dkt. No. 23-4, Def.'s SSUF ¶ 54.) Moreover, according to Plaintiff's own testimony, Plaintiff's only other experience in facilities services, outside of his position at SDSU, stemmed from working in janitorial services at Vons for about a year and a half, working in maintenance at Costco, and accompanying his mother on her cleaning jobs when he was a child. (*Id.* ¶ 55; Dkt. No. 23-5 at 10, Austin Depo. at 20:05–21.) None of Plaintiff's former experience in facilities services was supervisory. Accordingly, Ferris found that out of six rated criteria, Plaintiff met qualifications in only one category—experience in supervising over fifty employees—and that Plaintiff failed to meet qualifications for the

"ability to supervise and provide leadership to a large staff involved in facility maintenance and development activities in a major university setting and a bargaining unit environment." (Dkt. No. 23-4, Def.'s SSUF ¶ 56.) As such, Plaintiff does not state a *prima facie* case for disparate treatment, as he has not shown that he had the requisite experience for the Custodial Services Manager position.

Nor can Kopacz, the successful candidate, be considered a similarly situated comparator to Plaintiff. Unlike Plaintiff, Kopacz met all of the minimum qualifications and surpassed them: Kopacz had twenty-two years of experience supervising up to thirty employees and had previously served as an Assistant Director of Facilities in a university environment. (*Id.* ¶ 59.) According to Ferris, Kopacz further distinguished himself from the other candidates by his interview performance, from which Ferris gleaned that Kopacz had the right leadership style and personality to lead the custodial staff at SDSU. (*Id.* ¶ 60.) Whereas Plaintiff lacked the requisite supervisory experience in the facilities services context, Kopacz had experience that was exactly on point with that required.

Plaintiff claims that unbeknownst to Plaintiff, Ferris approved his termination on January 30, 2015 prior to interviewing him on February 2, 2015. (*Id.* ¶ 34.) Ferris has affirmed that the termination of Plaintiff's probationary employment was not a factor he took into consideration during the selection process. (*Id.* ¶ 50.) However, this disputed fact is not material—it suggests nothing about race-based disparate treatment, and it does not avail Plaintiff's required *prima facie* showing. Even if Ferris did in fact consider Plaintiff's termination, the termination would have constituted a legitimate, nondiscriminatory reason for Ferris to decide against advancing Plaintiff in the selection process.

Even if Plaintiff could establish a *prima facie* case, Defendant has articulated legitimate, nondiscriminatory reasons for promoting Kopacz and not selecting Plaintiff for the position. Although the Court need not reach the issue of pretext because Plaintiff has not opposed Defendant's motion, it is nonetheless unlikely that Plaintiff can show that Defendant's reasons for selecting Kopacz over Plaintiff were pretextual. Plaintiff's

subjective belief that Kopacz was substantially less qualified than him does not raise a genuine issue of material fact.  *See Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) ("[A]n employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact.").  The only objective qualification Plaintiff cites is the fact that Plaintiff has an MBA, whereas Kopacz has a bachelor's degree.  (Dkt. No. 23-5 at 37–39, Austin Depo. at 65:16–67:25.)  Indeed, when asked if there was any other reason that Plaintiff could point to, aside from the fact that the successful candidate was white and Plaintiff is black, that indicated to Plaintiff that Ferris made his employment decision on the basis of race, Plaintiff responded, "No."  (Dkt. No. 23-5 at 55; Austin Depo. at 84:19–24.)

　　　　While "[e]vidence of a plaintiff's superior qualifications, standing alone, may be sufficient to prove pretext," *Shelley v. Geren*, 666 F.3d 599, 610 (9th Cir. 2012) (finding factual dispute as to pretext because plaintiff had "significantly more years" of relevant work experience, more impressive and recent awards for on-the-job accomplishments, and a master's degree), here, Plaintiff has not shown that he met the minimum experience qualifications for the position to begin with, or that his experience in facilities services management was superior to—or even on par with—Kopacz's, *c.f. Raad v. Fairbanks North Star Borough School Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003) ("[T]he fact that an employer hired a *far less qualified* person than the plaintiff naturally gives rise to an inference that the non-discriminatory explanation offered by the employer is pretextual." (emphasis added)); *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006) ("[I]n a suit alleging failure to promote, a plaintiff seeking to rebut an employer's reliance on inferior job qualifications cannot simply compare herself to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination.").

　　　　In sum, there is no genuine issue of material fact as to whether Plaintiff was subjected to unlawful race-based disparate treatment.  Summary judgment is appropriate

18

3:15-cv-01930-GPC-BLM

as to Plaintiff's Title VII claim with respect to his non-selection for the Custodial Services Manager position.

Accordingly, the Court **GRANTS** Defendant's motion for summary judgment as to Plaintiff's disparate treatment claim in its entirety.

## CONCLUSION

The Court **GRANTS** Defendant's motion for summary judgment.

**IT IS SO ORDERED.**

Dated:  January 24, 2017

Hon. Gonzalo P. Curiel
United States District Judge